IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

KALLAAD W. CEPADA,              *

    Plaintiff,              *

    v.              *      CIVIL NO.: WDQ-10-0537

BOARD OF EDUCATION OF          *
BALTIMORE COUNTY,
                               *
    Defendant.
                               *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Kallaad W. Cepada sued the Board of Education of Baltimore County (the "Board") for retaliation and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII")[1] and § 1981 of the Civil Rights Act of 1866 ("§ 1981").[2] ECF No. 18 at 7-14. Pending is the Board's motion for summary judgment. ECF No. 56. No hearing is necessary. Local Rule 105.6 (D. Md. 2011). For the following reasons, the Board's motion for summary judgment will be granted.

---

[1] 42 U.S.C. §§ 2000e *et seq.*

[2] 42 U.S.C. § 1981.

## I. Background[3]

In 1996, the Board hired Cepada, an African–American male, as a classroom teacher in technical education. ECF Nos. 56-1 at 1, 65-2 at 2. In 1999, Cepada was assigned to Woodlawn High School ("Woodlawn"), where he taught full-time during the day and also taught night school. *See* ECF Nos. 18 at 4, 56-1 at 6, 20. Cepada performed satisfactorily as a teacher[4] and part-time disciplinarian[5] and generally, but not uniformly, had good relations with the Woodlawn students[6] and teachers.[7]

---

[3] The facts are taken from the Board's motion for summary judgment, ECF No. 56, Cepada's response in opposition, ECF No. 64, and the Board's reply, ECF No. 70, and their supporting exhibits. Cepada has docketed his exhibits, ECF No. 65, and so his evidence is cited using the "ECF" designation. The Board did not docket its exhibits, *see* ECF No. 56-2, or use a uniform indexing method. Thus, the Board's exhibits are designated either by "Dep." to indicate "Deposition" or by the document number preceded by "DR".

[4] ECF No. 65-16 at 6.

[5] Weglein Dep. at 40.

[6] DR234 (Sargent Interview) ("Cepada does have a positive effect on some of the students" and "is a good teacher overall"). Cepada occasionally, and admittedly, acts inappropriately while dealing with student misconduct, *see, e.g.*, ECF No. 65-11 at 17-18, but he generally gets along with his students, *see* DR41.

[7] Cepada's disciplinary history reveals several, isolated disagreements with other teachers. *See, e.g.*, DR48-49. However, the record contains several emails in which other Woodlawn teachers support Cepada's complaints about the Woodlawn administration. *See, e.g.*, 65-11 at 16.

Cepada did not, however, have a good relationship with the Woodlawn administration. In the 2007-2008 school year, Edward Donald Weglein, a white male, was principal of Woodlawn. ECF No. 65-16 at 2, 4. James Sargent, an African-American male, ECF No. 65-18 at 2, Starr Dimpfel, a white female, ECF No.65-15 at 48, and Dwayne Williams, DR197, were three assistant principals. Kenneth Miller, a white male, was also an assistant principal and scheduled teachers for classes. ECF No. 65-15 at 34, 48. Manuel Rodriguez, a Hispanic male, served as the area superintendent. ECF Nos. 65-12 at 40, 65-15 at 48. Cepada asserts that, before the 2007-2008 school year, Dimpfel and Weglein offered him a Dean of Students administrator position with a reduced teaching schedule to induce him to stay at Woodlawn[8] and use his skills at managing students in the halls. ECF No. 65-15 at 13-19, 32. Dimpfel and Weglein deny that they ever offered Cepada this position.[9] When Cepada returned to Woodlawn at the beginning of the 2007-2008 school year, he did

---

[8] Cepada contends that he was about to interview for positions at other schools but decided to remain at Woodlawn after he was offered the Dean position. ECF No. 65-12 at 50.

[9] Dimpfel and Weglein assert that all three Dean of Students positions were then filled by three African-American males and deny offering Cepada the position. See ECF No. 65-17 at 3; Weglein Dep. at 37-38, 40, 85, 95; Dimpfel Dep. at 138. Cepada alleges that the administration assigned another African-American male teacher, Mike Sye, to take over some Dean of Students responsibilities instead of Cepada. ECF No. 65-15 at 42.

3

not receive the Dean of Students position, and he was asked to teach Science--a course for which he was not certified.[10]  *See* ECF No. 65-15 at 34.

During the 2007-2008 school year, Cepada had several disagreements with the Woodlawn administration.  First, Cepada sent numerous emails to the Woodlawn administrators, teachers, and parents.  *See, e.g.,* ECF Nos. 56-1 at 11, 65-11 at 37; DR114.  These emails express Cepada's frustration with Woodlawn's administration,[11] and demand various changes to improve the school.[12]  *See, e.g.,* ECF Nos. 65-11 at 2-3, 7-9.

---

[10] Cepada states that he was initially asked to take on this assignment temporarily, because the original Science teacher was asked to leave.  ECF No. 65-12 at 50.  Cepada alleges that his placement became permanent against his wishes, even though Woodlawn hired a new Science teacher several weeks into the school year.  *Id.*  He also asserts that no other teachers were forced to teach classes for which they were not certified.  ECF No. 65-15 at 46.

[11] *See, e.g.,* ECF No. 65-11 at 37 ("In fact, my haters, it should be known that your opinion about me would always be much higher than my opinion about you.  However, I will continue to work with you to bring about constructive changes. . . . I just think that being fake is a waste of breath.  Your phoniness is quite apparent to[] many.").  The emails also accuse administrators of racial insensitivity, *see, e.g.,* ECF No. 65-11 at 29, discrimination against minorities in hiring and promotion, *see, e.g.,* ECF No. 65-12 at 24, and include other racial references, *see, e.g.,* ECF No. 65-11 at 37 ("Sorry, I missed the inferiority complex 'thingy.'  I am not driving Ms. Daisy (freely) and she better not expect me to do so.").

[12] Woodlawn had the worst test scores of all the schools in Baltimore County, and experienced many incidents of violence and substance abuse among its students.  *See, e.g.,* 65-11 at 17;

4

Some of the emails also suggested that members of the administration, particularly Dimpfel[13] and Weglein,[14] are racist. Dimpfel and Miller stated that they felt offended and harassed by Cepada's accusations.[15] DR153. In addition, Cepada was reprimanded for violating the Board's policy on email use in the workplace. ECF No. 65-13 at 30. Cepada alleges that no other teachers have been reprimanded for sending emails unrelated to school business. ECF No. 64-2 at 15.

---

DR111. During the 2007-2008 school year, it was going through a federally-mandated restructuring. ECF No. 65-13 at 4.

[13] Cepada accused Dimpfel of being racist, because she yelled at him at a staff meeting. ECF No. 65-13 at 33; see also DR154 ("You are very menacing and a significant number of minority folks speak[] ill of your alleged intent."). In an email he states, inter alia, that her yelling "[had] racial overtone[s] of your historic past" and asks her if he "look[s] like your 'butler' or someone to run your errands." Id.

[14] "I believe that had I have been a White staff member, I would have received [Weglein's] undivided attention and his assistance." ECF No. 65-13 at 15.

[15] One of Cepada's emails contained questions about the administration's experiences working in a diverse environment. See ECF No. 65-12 at 54. Some of the questions were fairly innocuous, (e.g., "Were you trained to deal effectively with a diverse population of professionals?"), but others were thinly veiled accusations of racism (e.g., "Why do you secretly target various folks of color to chastise them with the 'team' of ineffective leaders?"). See id. Miller responded that he felt harassed and was offended by the email, in part because his wife and child were minorities. Id. at 53. Cepada replied that Miller's "minority wife and bi-racial baby" did not "exempt [him] from all actions that may offend other minorities[.]" See id.

5

Cepada disagreed with the administration about what he considered their lax discipline of students.[16] In particular, he accuses Sargent of displaying favoritism toward children who Sargent knew from working at the nearby middle school. *See, e.g.*, ECF No. 65-12 at 36. He also alleges that the administration changed the punishments he imposed for student misbehavior, or chose not to impose any punishment, which undermined his authority and damaged his reputation. *See* Cepada Dep. at 141. He alleges that the administration treated the students that he disciplined, or recommended for discipline, differently because of his race. Cepada Dep. at 138.

Cepada emphasizes two incidents of allegedly inappropriate discipline. First, Cepada had a female student who he alleges threatened three times to kill him and told him she would bring a weapon to assault him. *See* ECF No. 65-12 at 4-5. Cepada

---

[16] On January 15, 2008, for example, Cepada sent an email to the administration asserting that a student had used profanities toward him and threatened his life during the lunch period. *See* ECF No. 65-6 at 2-3. Cepada complained that the administration had taken over 24 hours to suspend her, whereas if "one of the administrators received the same threats, an immediate suspension or expulsion would have been enacted." *Id.* In another email, Cepada reports that a student, on whom he had detected the scent of marijuana smoke, ran away from him. ECF No. 65-11 at 6. He asked Miller to let him know what consequence the student received. *Id.* Miller responded and said "I could not use him running away as a positive assessment," *id.*, apparently referring to the requirement that the school nurse verify a student's drug or alcohol impairment. ECF Nos. 65-12 at 23, 65-15 at 24; Cepada Dep. at 147. Cepada claims that these and similar incidents contributed to a hostile work environment. *See, e.g.*, Cepada Dep. at 147.

asserts that she was not removed from his class despite his many requests.[17] ECF No. 64-2 at 13. Second, Cepada had another female student whose removal he requested; the student had never caused a problem, but her mother had insinuated that Cepada had an inappropriate relationship with her daughter. ECF No. 65-12 at 40-42, 45. Cepada believed the student had a tendency to lie, and he feared that she would fabricate a story which could end his career. *Id.*; ECF No. 65-13 at 15. The administration refused to remove her from his class, ostensibly because neither the student, nor her mother, wanted her removed; the mother asserted that she had not meant to imply an inappropriate relationship with Cepada, and her daughter needed the class to graduate.[18] ECF Nos. 65-12 at 40-41, 65-13 at 11, 65-14 at 57.

---

[17] No contemporaneous evidence provided by the parties substantiates this incident, which is reported in Cepada's formal grievance complaints and his statements to Rodriguez in a meeting with his union representative after he was put on administrative leave. *See* ECF Nos. 65-1 at 5, 65-2 at 2, 65-12 at 4-5.

[18] Cepada does not offer any evidence, other than his statements, that the student's mother suggested that Cepada had an inappropriate relationship with her daughter, even though the mother's statements were made over email. ECF Nos. 65-12 at 5, 65-13 at 11. In Cepada's emails with the mother, she demanded that Cepada keep her fully apprised of her daughter's work in Cepada's class; Cepada resisted this demand because her daughter was an excellent student. *See* ECF Nos. 65-12 at 42, 65-13 at 12-14. The school counselor characterized Cepada's problem with the student as "personal" and noted that all the mother "wants from you is a weekly progress report which is her right." ECF No. 65-12 at 48.

7

He asserts that having the student in his class caused him to suffer migraine headaches and other stress-related ailments. Cepada Dep. at 138-40. Cepada alleges that the requests of white teachers to remove students, particularly students who raised safety concerns, were routinely honored.[19] ECF No. 64-2 at 13.

Cepada repeatedly emailed Rodriguez, and other administrators, to complain about these incidents, *see, e.g.,* ECF Nos. 65-11 at 26, 65-12 at 49, and the Woodlawn administration's disparate treatment of him and other teachers.[20]

---

[19] Cepada's emails to the administration do not include this accusation of discrimination; instead he states that transfers are common (he had over 50 from his class during the school year) and that the administration should accommodate his requests to remove students. ECF Nos. 65-12 at 45, 65-13 at 16. In his Deposition he identified several white teachers whose requests were accommodated--he says that he "know[s] specific incidents" when this occurred but did not provide any details. *See* ECF No. 65-15 at 45.

[20] Cepada alleges that the administration scheduled classes in a way that discriminated against minority teachers. *See* ECF Nos. 65-11 at 14, 65-12 at 29. He tells Rodriguez that he "can't point a finger at any specific individual" to blame for the disparities. ECF No. 65-11 at 14. To support his suspicions, he asserts that he often sees large groups of white teachers having coffee breaks during first and last period. ECF Nos. 65-12 at 39, 65-15 at 48-49. He claims that the schedule was intentionally set to allow white teachers to socialize at convenient times of the day. ECF No. 65-15 at 48-49. Although in his Deposition, he alleges that he did not "have those opportunities," *id.* at 49, in an email he informs Rodriguez that he has "not personally experienced any racially motivated directives" in the context of the schedule, *see* ECF No. 65-11 at 14.

*See, e.g.*, ECF No. 65-11. Cepada asserts that his requests for meetings and action to address his complaints were largely ignored. *See* ECF Nos. 65-12 at 49, 65-13 at 3. Cepada also repeatedly emailed county and Board officials. *See, e.g.*, ECF No. 65-11 at 29-30.[21] On March 6, 2008, following his reprimand for violating the Board's email policy, Cepada filed a discrimination charge with the Board's EEO office.[22] ECF No. 65-1.

On March 14, 2008, two students accused Cepada of assaulting them. ECF No. 65-12 at 2. Surveillance camera footage quickly revealed that the students had lied. *See id.* Cepada alleges that Rodriguez told him that the students' parent called a state agency, and Cepada had to be placed on administrative leave pending an investigation, even though he had not done anything wrong. ECF No. 65-15 at 39-40. Rodriguez did not remember that statement. ECF No. 65-12 at 5. Cepada's paid administrative leave began on March 14, 2008, ECF No. 65-15 at 41; he returned to Woodlawn a short time later. Cepada Dep. at 108. During his suspension, however, Cepada says he was told not to attend a PTA meeting and lost income from teaching night

[21] In his Deposition Cepada asserts that he was reprimanded by Rodriguez for speaking to a "state delegate" about problems at Woodlawn. ECF No. 65-15 at 31.

[22] Cepada alleges that he also filed an EEOC charge on April 7, 2008, the day he was placed on administrative leave. Cepada Dep. at 103. There is no evidence of this in the record.

school. Cepada Dep. at 108; ECF No. 64-2 at 15. After the suspension, Cepada alleges that he called the students' mother, and she told him she had never complained to the school or an outside agency about Cepada. Cepada Dep. at 99. Cepada suspected that he had been "set up" by the administration, *see* Cepada Dep. at 95-99, and he asserts that "[n]o other teacher [has] been treated in this manner for any similar incidents," ECF No. 64-2 at 15.

On April 4, 2008, Cepada learned that a student was contemplating suicide. Cepada Dep. at 101; DR194. Cepada went to find an administrator to whom he could disclose the information. Cepada Dep. at 101. He saw Sargent speaking to Robert Holland--an African-American male band director--in the lobby. *See* DR193. Cepada interrupted their conversation; Sargent told Cepada he would speak to him later, but Cepada insisted that they speak immediately. *Id.* Sargent and Cepada then began to yell at each other.[23] Their argument continued

---

[23] The parties dispute what was said during this argument. Three people not involved in the argument gave the following accounts; viewing the facts in the light most favorable to Cepada, it appears that Sargent initially said: "get off my nuts," Cepada responded "your wife's on mine," Sargent replied "I don't have a wife," and Cepada said "fuck you, bitch." DR197 (Williams Interview), DR251 (Student Statement). Cepada also gestured at Sargent with his middle finger. DR194 (Holland Letter). Cepada admits he acted inappropriately, but contends the argument was instigated by Sargent's initial offensive remark. *See* ECF No. 65-12 at 2.

outside, and was witnessed by several students and teachers. DR369-70. On April 7, 2008, following this argument, Cepada was again placed on paid administrative leave. ECF Nos. 65-13 at 2, 70 at 10. Sargent was not disciplined. ECF No. 65-12 at 2. Cepada's union representative spoke to Board officials. *See* ECF No. 65-9. The representative learned that they thought it was in the "best interest" of the students, administrators, and Cepada for him to stay "on administrative leave pending the outcome of the [EEO] investigation."[24] *Id.* Cepada did not return to Woodlawn and was transferred to another school for the 2008-2009 school year.[25] ECF No. 65-15 at 8, 51.

On May 20, 2008, Cepada filed a Charge of Discrimination with the Maryland Commission on Human Relations ("MCHR"), alleging race, sex, and age discrimination and retaliation. ECF No. 65-2 at 2-3. On May 23, 2008, the Equal Employment Opportunity Commission ("EEOC") issued a Notice of Charge of Discrimination to the Board. ECF No. 7-4. On November 30,

---

[24] The union representative also stated that Cepada "may be able to return to evening school" during his administrative leave, and that he had requested Board officials to award Cepada retroactive pay for the time he missed. ECF No. 65-9 at 2. The parties have offered no evidence, beyond Cepada's statements, whether Cepada returned to evening school or received back compensation. *Id.*; *see also* ECF No. 65-13 at 3, DR333, Cepada Dep. at 97.

[25] Cepada asserts that his transfer delayed the completion of his dissertation, because his research involved statistical analysis of the Woodlawn students. *See* ECF No. 65-15 at 11, 55.

11

2009, the EEOC issued Cepada a right-to-sue notice.    ECF No. 7-5.

On March 4, 2010, Cepada sued the Board for race, sex, and age discrimination and retaliation in violation of Title VII, § 1981, and the Age Discrimination in Employment Act ("ADEA").[26] ECF No. 1.    On September 27, 2010, Cepada's complaint was dismissed without prejudice for failure to: (1) establish that he had sued under Title VII and the ADEA within 90 days of receiving the right-to-sue notice; and (2) state a claim under § 1981.    ECF No. 16.    He was granted leave to amend all counts. *Id.* at 14.    On October 23, 2010, Cepada filed an amended complaint.    ECF No. 18.    On November 12, 2010, the Board moved to dismiss.    ECF No. 21.    On December 13, 2010, Cepada opposed that motion. ECF No. 26.    On January 13, 2011, the Board filed its reply. ECF No. 29.    The Court dismissed Cepada's claims of disparate treatment and failure to promote under Title VII and § 1981, and various violations of the ADEA, for failure to state a claim.    ECF Nos. 31, 30 at 13-14, 19-21.

The Board filed an interlocutory appeal to the Court's order to the Fourth Circuit Court of Appeals.    ECF No. 32.    On March 15, 2012, the Board withdrew its appeal.    ECF No. 41. On February 8, 2013, the Board moved for summary judgment.    ECF No. 56.    On April 8, 2013, Cepada responded in opposition.    ECF

---

[26] 29 U.S.C. §§ 621 *et seq.*

No. 64. On May 23, 2013, the Board filed its reply. ECF No. 70.

## II. Motion for Summary Judgment

### A. Standard of Review

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[27] In considering the motion, the judge's function is "not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to ... the nonmovant and draw all reasonable inferences in his favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from

[27] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' ... to express the direction to grant summary judgment." Fed.R.Civ.P. 56 advisory committee's note.

proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

B. Hostile Work Environment

Title VII prohibits an employer from discriminating against an employee because of race or sex. 42 U.S.C. § 2000e-2(a)(1). Section 1981 guarantees that all citizens shall have the same right to "make and enforce contracts ... as is enjoyed by [Caucasian] citizens." 42 U.S.C. § 1981. A plaintiff may plead a hostile work environment claim under these statutes. *See, e.g., Williams v. Giant Food, Inc.,* 370 F.3d 423, 430 n. 5 (4th Cir. 2004); *Connor v. Giant Food, Inc.,* 187 F. Supp. 2d 494, 496 (D. Md. 2002).

To survive an employer's motion for summary judgment on his hostile work environment claims, the plaintiff must show that the offending conduct was: (1) unwelcome;[28] (2) based on race or sex; (3) subjectively and objectively severe or pervasive enough to alter the plaintiff's conditions of employment and create an abusive atmosphere; and (4) imputable to the employer. *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183-84 (4th Cir. 2001)

---

[28] An employee's complaint about the offending conduct indicates that he found it unwelcome. *See EEOC v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 314 (4th Cir. 2008). Cepada extensively complained about the offending actions of Woodlawn administrators. *See, e.g.,* ECF No. 65-2 (complaint to the MCHR). Thus, he has established this element.

(*citing Causey v. Balog,* 162 F.3d 795, 801 (4th Cir. 1998)).
The elements are the same under Title VII or § 1981. *Id.* at
184.

Cepada contends that several Woodlawn administrators'
actions contributed to a hostile work environment. First, he
alleges that his requests to remove disruptive students from his
classroom were routinely ignored, although similar requests by
his white peers were honored. *See* ECF No. 64-2 at 13. Second,
he alleges that his white peers, "both male and female, were
assigned more favorable teaching schedules compared to their
African-American counterparts."[29] *Id.* at 14. Third, he contends
that Weglein "[made] numerous derogatory comments based on race
concerning African-American staff, which [the] Plaintiff
perceived as offensive." *Id.* He also alleges that he was: (1)
"promised a promotion to Dean of Students, along with a reduced
teaching[] schedule, if he returned to Woodlawn for the 2007-
2008 year;" (2) "assigned an additional class, Science, for
which he was not certified to teach;" (3) yelled at by Dimpfel;
(4) disciplined unfairly when he was accused of assaulting
students; (5) reprimanded for violating the school's email
policy; (6) disciplined after the altercation with Sargent even
though Sargent was not; and (7) prevented from attending a PTA

---

[29] For example, he asserts that a disproportionate number of
minority teachers were assigned to "mobile carts" instead of
given their own classrooms. ECF No. 65-12 at 4.

meeting. *See id.* at 13-16. Finally, he asserts that his numerous complaints about the disparate treatment were ignored and he was criticized after he "contacted his State Delegate" to complain. *Id.* at 14, 16. The Board contends that Cepada's claims "fall far short of the acceptable level required to establish a hostile work environment claim." ECF No. 56-1 at 15.

1. Hostile Work Environment Based on Sex

Beyond the allegations in his complaint[30] and a single conclusionary statement in his response,[31] Cepada has made no allegations that relate any of the actions described above to Cepada's sex. *See* ECF No. 64-2. He has offered no evidence that any employee of the Board discriminated against him because he is male. In the absence of such evidence, the Court will grant the Board summary judgment on Cepada's hostile work environment claim on the basis of sex. *See Spriggs,* 242 F.3d at 183-84; *Bouchat,* 346 F.3d at 526.

---

[30] In the complaint, Cepada alleges that "the requests of his female peers for the removal or reassignment of disruptive students are honored" and that the administration is "responsive to [his female peers'] concerns about safety." ECF No. 18 at 10-11. His later submissions do not document these allegations, and his response only alleges that administrators honored the student transfer requests of his white peers, while ignoring his. *See* ECF No. 64-2 at 13.

[31] "[T]he evidence supports the existence of both a pattern and practice of a hostile work environment that Plaintiff was subjected to because of his . . . sex (male)." ECF No. 64-2 at 2.

## 2. Hostile Work Environment Based on Race

To establish this claim, the plaintiff must show that "but for" his race, he "would not have been the victim of the alleged discrimination." *See Gilliam v. S.C. Dep't of Juvenile Justice,* 474 F.3d 134, 142 (4th Cir. 2007). The plaintiff must provide "legally sufficient evidence" of race discrimination in order to "transform an ordinary [workplace] conflict . . . into an actionable claim of discrimination." *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 281-82 (4th Cir. 2000) ("Even if [defendant] harbored some personal dislike of [plaintiff] that made [plaintiff's] job more difficult or stressful, an employer is not required to like his employees.") (internal citations and quotations omitted)). Absent direct evidence of racial animosity, the plaintiff may rely on evidence of differential treatment of similarly situated white employees. *See Gilliam,* 474 F.3d at 142. To be sufficient, the evidence must consist of more than speculation, circumstantial evidence, and "conclusory" or "general" statements--the plaintiff's evidence must prove a "direct or inferential connection between the plaintiff's allegations and her race" supported by specific evidence.[32] General allegations of differential treatment must be

---

[32] *See id.; Hawkins,* 203 F.3d at 282; *Khoury v. Meserve,* 268 F. Supp. 2d 600, 612-13 (D. Md. 2003) *aff'd,* 85 F. App'x 960 (4th Cir. 2004); *Wang v. Metro. Life Ins. Co.,* 334 F. Supp. 2d 853, 863-64 (D. Md. 2004).

substantiated by "accounts of specific dates, times or circumstances."[33]

Cepada has offered no evidence, beyond his speculations, that any of the actions he claims contributed to a hostile work environment were motivated by racial animus. *See Sonpon v. Grafton Sch., Inc.*, 181 F. Supp. 2d 494, 503 (D. Md. 2002) ("Plaintiff's mere speculation that [defendant] was motivated by racial animus in giving her a written rather than verbal reprimand is not evidence."). He alleges that he was not promoted to Dean of Students, and forced to teach Science, ECF No. 64-2 at 13-14, but he has offered no evidence that these personnel decisions were based on race--thus, these incidents cannot support an actionable claim of discrimination.[34]

---

[33] *See Carter v. Ball*, 33 F.3d 450, 461-62 (4th Cir. 1994); *Gilliam*, 474 F.3d at 142-43; *Jackson v. State of Maryland*, 171 F. Supp. 2d 532, 541 (D. Md. 2001).

[34] *See Simmington v. Gates*, CIVA DKC 08-3169, 2010 WL 1346462, at *15 (D. Md. Mar. 30, 2010) ("That Plaintiff may have felt demeaned or demoralized by the actions of management does not create a federal cause of action for hostile work environment merely because Plaintiff happens to belong to a class protected by Title VII."); *see also Steadman v. Crystal Gateway Marriott*, CIV.A. 01-1083-A, 2002 WL 32502351 (E.D. Va. Mar. 11, 2002) *aff'd,* 45 F. App'x 288, at *5 (4th Cir. 2002) ("Congress did not intend for Title VII to turn the federal courts into human resource or personnel departments . . . ."). The three Dean of Students positions were held by African-American males. Weglein Dep. at 85. The person who Cepada alleges took over some Dean of Students' responsibility was also an African-American male, ECF No. 65-15 at 42. This strongly suggests that Cepada was not discriminated against on the basis of his race.

Similarly, he alleges that because of his race he was unfairly reprimanded for violating the Board's email policy, *see* ECF No. 64-2 at 15, but he provides no evidence to support this claim,[35] nor any of his other claims that he was unfairly disciplined by the administration because of his race,[36] *see id.* at 14-16. Even

---

[35] The evidence is that Cepada was disciplined for labeling Dimpfel a racist, after she yelled at him in a staff meeting. *See* ECF No. 65-13 at 30-32. Although Cepada contends that Dimpfel yelled at him because of his race, *id.* at 33, he offers no evidence beyond his own speculations to support this claim. *See Dawson v. United States*, 549 F. Supp. 2d 736, 743 (D.S.C. 2008) *aff'd,* 368 F. App'x 374 (4th Cir. 2010) ("unnecessarily harsh[]" treatment, including yelling at plaintiff, was not actionable because there was no evidence it related to plaintiff's race). Finally, although Cepada alleges that the discipline was unfair because none of his colleagues was ever disciplined for similar conduct, *see* ECF No. 64-2 at 15, the evidence is that Cepada was not disciplined for violating the email policy until the emails provided a basis for Dimpfel to assert that she had been harassed. *See* ECF No. 65-13 at 30-32; DR152; DR153 (Dimpfel contemplates filing an EEOC charge of discrimination and harassment against Cepada). There is no evidence that the discipline Cepada faced, or Dimpfel's yelling, occurred because of Cepada's race.

[36] Cepada relies on the different treatment of himself and Sargent following their argument to support his hostile work environment claim. ECF No. 64-2 at 16. However, he offers no evidence that the decision to discipline him, and not Sargent, was based on his race. That he and Sargent are both African-Americans, ECF No. 65-18 at 2, is evidence that the decision was not race-based. Similarly, he provides no evidence that the administration's decision to place him on leave following the students' accusations of assault, ECF No. 65-12 at 2, was based on race. Even if, as Cepada claims, Rodriguez lied about the parent's complaint, ECF No. 65-15 at 39-40, this objectively offensive conduct cannot support an actionable claim of hostile work environment unless Cepada offers evidence that Rodriguez lied because of Cepada's race. *See Carson v. Giant Food, Inc.*, 187 F. Supp. 2d 462, 478 (D. Md. 2002) *aff'd sub nom. Skipper v. Giant Food, Inc.*, 68 F. App'x 393 (4th Cir. 2003) (denying

if "no other teacher" was disciplined for similar conduct, *see id.* at 15, disparate treatment that is not based on Cepada's race does not create a legally cognizable hostile work environment claim.[37] *See Hawkins*, 203 F.3d at 280-82 (denying plaintiff's hostile work environment claim, because plaintiff never showed that her supervisor's "low regard" for her in comparison to her white peers, and resulting uneven treatment, "was due to race").

Cepada also alleges that Weglein made "numerous derogatory comments based on race concerning African-American staff." ECF No. 64-2 at 14. His complaint alleges that Weglein said "'this is not soul train' . . . when addressing African-American staff or students." ECF No. 18 at 5. None of the evidence provided by the parties refers to this remark, or any other racial

---

hostile work environment claim, because "[plaintiff] has presented no evidence the tire slashings or [offensive] graffiti were based on race"). Accordingly, without evidence of racial animus, neither of these incidents support Cepada's hostile work environment claim. *See Hawkins,* 203 F.3d at 281-82 ("[It] is for [the employer], not the courts, to rule on the wisdom and generosity of [plaintiff's supervisor's] management practices.").

[37] Cepada alleges that he was unfairly excluded from a PTA meeting while he was on administrative leave. *See* ECF No. 64-2 at 15. He offers no evidence that this exclusion was based on his race, or that similarly situated individuals outside of his protected class were not excluded from PTA meetings while on administrative leave--thus, his exclusion does not support Cepada's hostile work environment claim. *See Gilliam*, 474 F.3d at 142-43; *Tawwaab v. Virginia Linen Serv., Inc.*, 729 F. Supp. 2d 757, 774-76 (D. Md. 2010).

comment, made by any Board employee.[38]  The only race-based

comments referred to in the parties' evidence are those made by

Cepada, *see, e.g.*, ECF No. 65-12 at 54, and the evidence is that

many Woodlawn administrators found Cepada's comments derogatory

and offensive *toward them*, rather than the other way around.

*See, e.g.*, *supra* note 15.  Accordingly, Cepada's claim based on

racial comments fails.

With respect to his allegations of differential treatment

based on race, Cepada has not substantiated his claims with

dates, times, or circumstances.  *See Carter*, 33 F.3d at 461-62.

Cepada has not provided any evidence of instances in which a

white teacher's discipline of a student was upheld, while

Cepada's discipline of a student was not.[39]  Although Cepada

complains in several emails that administrators would have dealt

---

[38] Although Cepada alleges that Sargent made several offensive
remarks during their argument, none of these statements related
to race.  *See supra* note 23.  Vulgar or discourteous statements,
unrelated to race, are not actionable under Title VII.  *See
Karim v. Staples, Inc.*, 210 F. Supp. 2d 737, 752-53 (D. Md.
2002).

[39] *See Jackson*, 171 F. Supp. 2d at 541.  The evidence provided by
the parties contains multiple examples of situations when the
administration imposed the discipline Cepada had recommended,
even if they did not do so as quickly as Cepada thought
necessary.  *See, e.g.*, ECF Nos. 65-6 at 2-3, 65-14 at 35-36, 65-
15 at 23.  Although Cepada complains in several emails about
uneven discipline, he states that he was concerned about its
effect on student behavior and students' feelings of safety
rather than his belief that he was being discriminated against
on the basis of race.  *See* ECF No. 65-12 at 19, 24, 29.

more severely with student misconduct if they had personally experienced it, *see* ECF No. 65-13 at 21, Title VII does not protect against discrimination on the basis of whether the plaintiff is a teacher or part of the administration,[40] nor does it demand that a school administration impose any particular discipline on misbehaving students.[41] Similarly, Cepada has not substantiated his claims with specific accounts of times when white teachers' requests to remove students were honored, and his similar requests were ignored.[42] Although Cepada alleges that two of his removal requests were unfairly ignored, *see* ECF No. 64-2 at 13, there is no evidence that either of these decisions were based on Cepada's race.[43] Finally, Cepada has

---

[40] *See* 42 USC § 2000e-2(a)(1) (prohibiting discrimination on the basis of "race, color, religion, sex, or national origin").

[41] *Cf. Lucero v. Nettle Creek Sch. Corp.*, 1:05-CV-0266-RLY-WTL, 2008 WL 3819868, at *9, *14 (S.D. Ind. July 3, 2008) *aff'd*, 566 F.3d 720 (7th Cir. 2009) (denying Title VII claim based in part on sexual harassment of a teacher by students, because "although Plaintiff may disagree with the discipline imposed upon these students, that does not establish that the Defendants were deliberately indifferent to her complaints" about their behavior) (*citing Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 119 S.Ct. 1661, 1674, 143 L.Ed.2d 839 (1999)).

[42] Although Cepada alleges knowledge of specific incidents of differential treatment of removal requests, *see* ECF No. 65-15 at 45, he has not provided "dates, times or circumstances," *Carter*, 33 F.3d at 461-62.

[43] The record contains only minimal references to the incident of the student's threats to kill Cepada, *see supra* note 17, and he provides no evidence of the removal requests and denials that he alleges occurred by email, ECF No. 64-2 at 13. Cepada's

attempted to support his claims of differential treatment in scheduling teachers by identifying times of the day when he saw large groups of white teachers congregating socially. *See, e.g.,* ECF Nos. 65-12 at 39. Even if Cepada's observations substantiated his claims of differential treatment, Cepada has not shown that *he* received a less favorable teaching schedule than his white peers.[44] Cepada cannot base a claim of hostile work environment based on discrimination that others suffered.[45] *See Honor v. Booz-Allen & Hamilton, Inc.,* 383 F.3d 180, 190-91 (4th Cir. 2004) ("[A]n individual plaintiff in a private, non-

---

requests to remove the student whose mother allegedly implied that Cepada had an inappropriate relationship are thoroughly documented. *See, e.g.,* ECF No. 65-12 at 40-45. However, this correspondence suggests that the administration had several reasons, all unrelated to race, for denying Cepada's removal requests, including that Cepada could not provide any support for his claim that the student's mother had insinuated that he had an inappropriate relationship with her daughter. *See* ECF Nos. 65-12 at 40-41, 65-13 at 11, 65-14 at 57.

[44] In his deposition, Cepada alleges that he was denied "opportunities" for group socialization afforded to white teachers, *see* ECF No. 65-15 at 48-49, but in an email sent in September 2007, he notes that he has "not personally experienced any racially motivated directives" in the context of the schedule, *see* ECF No. 65-11 at 14. He offers no evidence or allegations that his teaching schedule was less favorable than other teachers. *See* ECF No. 64-2 at 14 ("Plaintiff believes his Caucasian peers . . . were assigned more favorable teaching schedules compared to their African-American counterparts.").

[45] Cepada states that more minority teachers than white teachers were assigned to "floating carts" rather than their own classrooms. *See* ECF No. 65-1 at 5. However, he never asserts that *he* did not have his own classroom. *See, e.g., id.*

class action alleging employment discrimination is not litigating common questions of fact, but the discrete question of whether the employer discriminated against the plaintiff in a specific instance." (quoting *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761 (4th Cir. 1998)). Accordingly, Cepada has failed to show that he was treated differently from his similarly situated white peers on the basis of race.

Finally, Cepada alleges that his numerous complaints about the disparate treatment he received were ignored. *See* ECF No. 64-2 at 14. However, his evidence does not show that his requests were ignored because of his race. There is evidence that many of Cepada's complaints were acknowledged through emails and meetings. *See, e.g.*, ECF Nos. 65-12 at 7, 65-14 at 45. That the administration did not react to Cepada's complaints in the exact manner he wanted,[46] or agree to all his numerous requests for meetings,[47] does not alone establish discrimination against him on the basis of his race.[48] Thus, the

---

[46] *See, e.g.*, ECF No. 65-15 at 49-50 (stating that Rodriguez would not meet with him about his complaints about the schedule, but Rodriguez did "listen[] and sen[d] [an] email").

[47] *See* ECF No. 65-15 at 50 (Cepada made "at least 20 requests to meet with [Rodriguez]").

[48] Cepada also alleges that Rodriguez criticized him for complaining to "his State Delegate about disparate treatment directed toward him." ECF No. 64-2. However, he offers no evidence that this incident occurred, or that it was related to Cepada's race.

Court will grant the Board summary judgment on Cepada's hostile work environment claim. *See Bouchat,* 346 F.3d at 526 (function of trial judge on summary judgment is to "prevent factually unsupported claims . . . from proceeding to trial").

C. Retaliation

Title VII makes it unlawful for an employer to "discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge ... or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a).

To survive an employer's motion for summary judgment, a plaintiff must show direct evidence of discrimination, or establish a *prima facie* case that raises an inference of illegal conduct.[49] The burden-shifting approach of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) applies to Title VII retaliation claims.[50] First, the plaintiff must establish a *prima facie* case of retaliation. *See Laber v. Harvey,* 438 F.3d 404, 432 (4th Cir. 2006). The burden

---

[49] *Coleman v. Md. Court of Appeals,* 626 F.3d 187, 190 (4th Cir. 2010); *Diamond v. Colonial Life & Accident Ins. Co.,* 416 F.3d 310, 318 (4th Cir. 2005).

[50] *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 248 (4th Cir.2000).

then shifts to the employer to produce a legitimate, nondiscriminatory reason for the adverse action. *See id.* The plaintiff must then demonstrate that the employer's reason was mere pretext for retaliation by showing "both that the reason was false *and* that discrimination was the real reason for the challenged conduct." *Jiminez v. Mary Wash. Coll.,* 57 F.3d 369, 378 (4th Cir. 1995) (internal quotation marks omitted).

To establish a *prima facie* retaliation claim under Title VII or § 1981, the plaintiff must show: (1) protected activity; (2) "materially" adverse employment action; and (3) a causal connection between the protected activity and materially adverse action. *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Bryant v. Aiken Reg'l Med. Ctrs. Inc.,* 333 F.3d 536, 543 (4th Cir. 2003). An employee engages in protected activity if he opposes an "unlawful employment practice" like discrimination. 42 U.S.C. § 2000e-2(a)(1), -3(a). Protected activity under § 1981 includes opposing "policies or practices that discriminated against any person on the basis of race." *Proa v. NRT Mid Atl., Inc.,* 618 F. Supp. 2d 447, 471-72 (D. Md. 2009). A "materially" adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington,* 548 U.S. at 68, 126 S.Ct. 2405; *see also Harman v. Unisys Corp.,* 356 Fed. Appx. 638, 641 (4th Cir. 2009). Because

26

employees are protected "not from all retaliation, but from retaliation that produces an injury or harm," materially adverse actions do not include "trivial" harms. *See Burlington,* 548 U.S. at 67-69, 72-73, 126 S. Ct. 2405. If the employer takes the action "shortly after" learning about the protected activity, courts may infer a causal connection between the two. *Price v. Thompson,* 380 F.3d 209, 213 (4th Cir. 2004).

Cepada alleges that the Board discriminated against him, because of his complaints to Rodriguez, and because he filed an internal EEO complaint. ECF No. 64-2 at 17. In retaliation for his complaints, Cepada alleges these materially adverse actions: (1) he was placed on administrative leave twice which resulted in lost income from night school and exclusion from a PTA meeting; (2) he was yelled at by Dimpfel;[51] (3) he was denied the Dean of Students position and forced to teach Science;[52] and (4)

---

[51] As this Court held previously, ECF No. 30 at 25, Dimpfel yelling at Cepada is not a materially adverse employment action. *Burlington,* 548 U.S. at 68 (occasional "abusive language" is insufficient to show retaliation (citation and internal quotation marks omitted)); *Munday v. Waste Mgmt. of N. Am., Inc.,* 126 F.3d 239, 241-43 (4th Cir. 1997).

[52] Even assuming these actions were "materially adverse," they occurred at the beginning of the 2007-2008 school year. ECF No. 65-15 at 12-13. Cepada testified that all the actions he complained about occurred during the 2007-2008 year. ECF No. 65-15 at 8. Accordingly, Cepada has failed to establish a "causal connection" between any protected activity and these actions. *See Burlington,* 548 U.S. at 68; *Middlebrooks v. Winter,* CIV.A. WGC-05-3209, 2008 WL 8116107, at *37 (D. Md. Mar. 19, 2008) *aff'd,* 333 F. App'x 762 (4th Cir. 2009) ("By

he was transferred from Woodlawn to another school.[53]  ECF No.

64-2 at 14, 17, 21, 24.[54]  The Board disputes Cepada's claims,

and also asserts that any adverse actions it took were

"[l]egitimate and [n]on-retaliatory."  ECF Nos. 56-1 at 18-22,

70 at 10-12

    Cepada has established a *prima facie* case of

discrimination.  He engaged in protected activity--filing an EEO

complaint and complaining to his supervisors of disparate

---

definition, if the alleged materially adverse action occurred
*before* Plaintiff engaged in protected activity, the alleged
materially adverse action cannot be classified as
*retaliation.*")(emphasis in original)).

[53] An involuntary transfer to a new school without loss of pay or
status is generally not considered a materially adverse
employment action.  *See, e.g., Holleman v. Colonial Heights Sch.
Bd.*, 854 F. Supp. 2d 344, 353-55 (E.D. Va. 2012), *appeal
dismissed* (May 7, 2012).  Here, Cepada asserts that the transfer
harmed him by interrupting his dissertation research on the
Woodlawn students.  *See* ECF No. 64-2 at 5.  However, he has not
shown that he has been denied access to Woodlawn for research or
could not conduct the study at his new school.  Accordingly,
Cepada's transfer was not a materially adverse employment
action.  *Cf. Settle v. Baltimore Cnty.*, 34 F. Supp. 2d 969, 989
(D. Md. 1999) *aff'd sub nom. Settle v. Baltimore Cnty. Police
Dep't*, 203 F.3d 822 (4th Cir. 2000) and *aff'd sub nom. Harris v.
Earp*, 203 F.3d 820 (4th Cir. 2000) ("[N]ot everything that makes
an employee unhappy is an actionable adverse action.") (internal
quotations and citations omitted)).

[54] Cepada also alleges that actions taken by Sargent concerning
student discipline were retaliatory, but Cepada's brief does not
explain how Sargent's discipline choices related to any action
that Cepada took or constituted discrimination against Cepada.
ECF No. 64-2 at 10-11.  Moreover, Cepada asserts that Sargent's
discipline choices "depend on who the kid was," not on Cepada's
actions.  *See id.*

treatment[55]--and the Woodlawn administration knew about this

activity.[56]   *See Holland v. Washington Homes, Inc.*, 487 F.3d 208,

218 (4th Cir. 2007) (plaintiff must show defendant knew of

plaintiff's protected activity to establish causal connection).

He suffered materially adverse employment action--

administrative leave resulting in loss of night school pay and

exclusion from a PTA meeting[57]--that occurred "shortly after" his

---

[55] *See, e.g., Ali v. Energy Enter. Solutions, LLC,* No. DKC-09-1628, 2010 WL 2253653, at *6 (D. Md. June 2, 2010) (employee's letter to his supervisors "opposing disparate [treatment]" was protected activity); *Laughlin v. Metro. Wash. Airports Auth.,* 149 F.3d 253, 259 (4th Cir. 1998) ("voicing one's opinions in order to bring attention to an employer's discriminatory activities" is protected opposition activity).

[56] *See, e.g.*, ECF No. 65-12 at 53 (email to Rodriguez that copies Woodlawn administrators); ECF No. 65-13 at 30-31 (Cepada emails administration to inform them of his intent to file a complaint with the Board's EEO office).

[57] Suspension with pay, "pending a prompt investigation into allegations of wrongdoing," is not generally considered a materially adverse employment action. *See, e.g., Jarvis v. Enter. Fleet Servs. & Leasing Co.,* CIV.A. DKC 07-3385, 2010 WL 1068146, at *18 (D. Md. Mar. 17, 2010) *aff'd,* 408 F. App'x 668 (4th Cir. 2011)(internal quotation marks omitted).  However, Cepada alleges that he lost income from night school because of his suspensions, *see* ECF No. 64-2 at 16.  He also asserts that he was excluded from a PTA meeting while on leave, *see id.* at 15, which this Court previously held is a materially adverse employment action, *see* ECF No. 30 at 25.  Although Cepada has offered minimal evidence to support these claims, viewing the facts in the light most favorable to Cepada, the Court finds that Cepada's two paid suspensions were materially adverse employment actions, because of the alleged loss of pay and exclusion from the meeting.

protected activity.[58]  However, Cepada has not rebutted the

Board's "legitimate, nondiscriminatory" reasons for Cepada's two

placements on administrative leave.  *See Laber,* 438 F.3d at 432.

The Board contends that he was placed on the first

administrative leave, "in direct response to a pending

investigation into claims that [Cepada] assaulted two students."

ECF No. 70 at 11.  Cepada acknowledges that this accusation was

made, and an investigation occurred.  ECF No. 64-2 at 14-15.

Also, as discussed above, Cepada has not shown that the

administration had a discriminatory motive for putting him on

administrative leave following these accusations.  *See supra*

note 36.  The Board contends that he was placed on the second

administrative leave, as a "direct response to [Cepada's

admitted altercation with [an African-American] supervisor . . .

Sargent."  ECF No. 70 at 12.  Cepada acknowledges that this

argument occurred, and he acted inappropriately.  *See* ECF No.

65-12 at 2.  As discussed above, Cepada has not shown that the

---

[58] *See Price,* 380 F.3d at 213.  Cepada was placed on his first
administrative leave within two weeks of filing a complaint of
disparate treatment with the Board's EEO, and his second leave
occurred only a few weeks later.  *See* ECF Nos. 65-1 at 4-5, 65-
13 at 2, 65-15 at 41.  Thus, the materially adverse actions
occurred "shortly after" Cepada's protected activity.  *See,*
*e.g., Silva v. Bowie State Univ.,* 172 Fed. Appx. 476, 478 (4th
Cir. 2006) (employee who suffered a materially adverse action
ten weeks after filing a complaint with his employer's EEO
office stated a *prima facie* retaliation claim (*citing Price,* 380
F.3d at 213)).

discipline he received was motivated by discrimination. *See*
*supra* note 36. Accordingly, the Court will grant summary
judgment to the Board on Cepada's retaliation claim.

III. Conclusion

For the reasons stated above, the defendant's motion for
summary judgment will be GRANTED.


_9/19/13_
Date

William D. Quarles, Jr.
United States District Judge